UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HERBERT WELLER,<br>Plaintiff,<br><br>vs.<br><br>LIFE CARE CENTERS OF AMERICA, a foreign corporation, and WESTSIDE LIMITED PARTNERSHIP, an Indiana limited partnership,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:04-cv-1977-RLY-WTL |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Herbert Weller, was employed as a maintenance supervisor at Westside Retirement Village in Indianapolis, Indiana. The facility offers both independent living facilities for retirees and nursing home type services. There are apparently several business entities involved in the ownership and management of the facility. Some distinctions seem to exist based on whether one is referring to the assisted living or the nursing home operations, but at times both parties discuss the facts as though those distinctions were nonexistent. Weller's employment ended in July of 2004. He contends that he was terminated because of his age and disability. He originally sued only Life Care Centers of America, but after it responded by claiming that it had been misidentified and that it should have been properly identified as Westside Limited Partnership, Weller amended his complaint to include both entities. The two Defendants have pled and defended jointly since that point, including the assertion of an affirmative defense that

Life Care Centers of America is not Plaintiff's employer and the provision of an interrogatory response indicating that Westside Limited Partnership holds the license for the facility, which is managed by American Lifestyles, Inc., a wholly owned subsidiary of Life Care Centers of America, Inc. While the parties have yet to agree on which of the Defendants was actually Plaintiff's employer, the issue is not particularly important at this point since Defendants have offered up Westside Limited Partnership as the proper defendant party.

The Defendants have filed a Motion for Summary Judgment, claiming a lack of any material question of fact which would prevent judgment from being entered in their favor on the entirety of Plaintiff's Amended Complaint. For convenience, and only for purposes of this entry, the court will refer to the Defendants and the facility collectively as "Westside". Weller has responded to Westside's motion arguing that both of his claims should survive summary judgment.[1]

## I. STANDARD OF REVIEW AND EVIDENTIARY REQUIREMENTS

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A

[1]Westside filed a reply brief considerably past the time it was due and after this court had nearly completed this entry. Consequently, that brief was not considered by the court in reaching its decision.

dispute about a material fact is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Id.* at 255.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A party moving for summary judgment on a claim on which the nonmovant party bears the burden of proof at trial may discharge its burden by showing, "that is, pointing out" an absence of evidence to support the nonmovant's case. *Id*. at 325.

A plaintiff alleging intentional discrimination in employment can avoid summary judgment in two ways: (1) by presenting direct evidence of discriminatory intent; or (2) by presenting indirect circumstantial evidence under the burden-shifting method of proof established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See, e.g., Mills v. Health Care Service Corp.*, 171 F.3d 450, 454 (7th Cir. 1999); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722-23 (7th Cir. 1998), *cert. denied*, 525 U.S. 870 (1998). In his response brief, Weller indicates that he is employing the "mosaic of evidence" approach to establishing direct evidence of discrimination. This

approach is derived from the Seventh Circuit Court of Appeals decision in *Troupe v. May Dept. Stores Co.*, 20 F.3d 734 (7th Cir. 1994) and amounts to reliance upon circumstantial evidence under the direct method of proof.

The "mosaic of evidence" under *Troupe* can consist of many different kinds of evidence, none conclusive in itself. *Id*. at 737. However, a plaintiff must establish enough “bits and pieces” to satisfy his burden of producing sufficient evidence to allow a rational jury to infer that he was the victim of discrimination. *Id*. Indeed, this accumulation of circumstantial evidence must point directly at a discriminatory reason for the employer’s action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). The Seventh Circuit has noted, however, that whether the evidence presented is characterized as ‘indirect’ evidence or ‘mosaic’ evidence, what is required to survive summary judgment is sufficient evidence from which the trier of fact could reasonably infer that the plaintiff was fired because he was a member of a protected class. *See, e.g., Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1089-1090 (7th Cir. 2000).

## II. BACKGROUND

Weller began working at Westside at the end of September 2002. He was 59 years old at the time his employment ended in July of 2004. David Swanson, as both Executive Director and later as Interim General Manager, had authority to direct the activities of Weller. Accepting Weller’s version of any contested facts, as his tenure lengthened,

Swanson became the principal person he took direction from, though others also supervised and evaluated him. Weller received very good employee evaluations. However, he claims that Swanson was critical of his age and of the limp Weller walked with as a result of a past fall which fractured his hip.[2]

The critical discriminatory remarks Weller claims were made by Swanson include:

> 1) A question from Swanson to Weller, during their very first conversation, regarding the impact of Weller's previous injury and noticeable limp on his ability to work, followed by a description of a prior working relationship wherein Swanson was disappointed with having a maintenance supervisor whose disability prevented him from performing effectively;
>
> 2) Encouragement from Swanson on several occasions for Weller to try not to walk with such a pronounced limp;
>
> 3) A rhetorical comment to the effect of "I wish he wouldn't walk like that - he looks bad" which was overheard by a passing employee;
>
> 4) A statement Swanson made to a department head describing Weller as old, worthless and needing to be gone;
>
> 5) A statement to Weller that he should consider dyeing his hair as another employee had done because it would make him look younger;
>
> 6) Immediately following a staff meeting wherein Swanson was extremely critical of his department heads, including Weller, and shortly before a meeting with visiting upper management, which resulted in Weller leaving Westside, Swanson told Weller that he was an example of what upper management meant by having the "wrong person on the bus" because he was "too old and crippled."

---

[2]While at least some physical limitation is apparent from Weller's gait, he never presented Westside any medical information relative to work restrictions due to the fact that his responsibilities were, for the most part supervisory. He also never asked for any type of accommodation, other than the time he indicated to Swanson that he would prefer not to bus tables at a Christmas party put on by the staff because it would cause him discomfort.

In addition to the comments made by Swanson, Weller contends that Swanson fostered an environment, generally, that was highly critical of the aged and infirm. Weller says that he was encouraged by Swanson to write up a 65-year old employee who worked in maintenance or to assign the older employee work that might make him mad enough to quit because the employee was "too old and working only part-time." Weller complains as well that Swanson made him bus tables for two Christmas parties Westside put on for the residents and their families, despite his request for other duties and Swanson's knowledge that the first time Weller performed the work it left him in severe physical pain. Former employees state that they were told by Swanson to remove wheelchair-bound residents from the lobby or make sure residents who were in wheelchairs or scooters did not congregate in the lobby because such a circumstance did not leave visitors with a good impression of the facility. Another former employee testified that Swanson replaced her as head of housekeeping with a younger employee and, while she was head of housekeeping, would probe with her the possibility that Weller was not doing his job well and solicit critical comments from her. All of this, according to Weller, contributes to a mosaic of circumstantial evidence from which discrimination can be inferred.

In March of 2004, an in-house "pre-survey" was completed of the facility, and department heads, including Weller, were informed of the poor results. As a result, a number of changes began to occur at the facility and Weller claims department head

positions were advertised in the paper. Consequently, Weller wrote to the corporate office of American Lifestyles, Inc. in Tennessee, indicating that he was fearful of losing his job, pointing out his past strong evaluations and blaming past institutional maintenance protocol, with which he disagreed but followed, as the cause of any poor results in his department. He sent an e-mail message to the corporate offices a few weeks before he lost his job with similar concerns. He made no mention of any discrimination in the letter or e-mail, nor did he allege discrimination in the follow-up telephone call he received from Kip Pammenter, CFO of American Lifestyles, Inc., after Weller's e-mail was received at corporate headquarters.

In May and June of 2004, Swanson complained to Weller regarding weed control on the premises. Swanson says it took four complaints from him before Weller addressed the problem and also says, in general, despite past exemplary performance reviews from other supervisors, Weller was not performing his job well in 2004. On July 14, 2004, Weller informed Swanson that he needed to take the following day off to go to the doctor[3] because he had recently missed a scheduled appointment in order to be at Westside when a manager from out of town was visiting the facility. Swanson told Weller he needed to bring back a doctor's slip, since he was taking an entire day off. This request was not consistent with past company policy and Weller believed Swanson was singling him out.

---

[3]Of no particular import, other than to keep the record straight, the appointment Weller was referring to was actually one with his dentist as opposed to his doctor, though he admits to having said doctor at the time.

He was admittedly mad and told Swanson the request was ridiculous. He also made comments to several other employees that he was going to take the issue up with Swanson at the next all staff meeting and Swanson would be left with "egg on his face" because company policy did not require him to bring back a doctor's slip from a medical appointment. Weller also referred to Swanson as a bigot, a racist and a supremacist.

On July 15, 2004, Swanson was told by others that Weller was actively and openly complaining of Swanson, and advising people that he was going to confront Swanson and leave him with egg on his face at the next staff meeting. Swanson went so far as to solicit statements from three employees with regard to Weller's actions. Those statements included descriptions of angry outbursts by Weller in front of employees and residents, where he criticized Swanson and his request that Weller bring back a doctor's slip. Two of the employees solicited also described Weller's angry exhibition as including vulgar name calling and one said he threw a soda bottle across the room when complaining of Swanson. On July 16, 2004, Swanson confronted Weller with what he had been told about Weller's open resistence to his request and Weller's plans to humiliate Swanson at the next staff meeting. He told Weller that he could be fired for such insubordination. Upset, Weller responded by telling Swanson that his actions were not insubordinate, that Swanson's actions were not consistent with company policy and that Swanson could do whatever he wanted about Weller's continued employment.

All of the above sets the stage for the meeting that occurred on July 20, 2004. Kip

Pammenter had been contacted by Swanson regarding Weller's recent conduct. Swanson had also approached Diana Kodadek, Director of Marketing and Sales for American Lifestyles, Inc., about his concern over Weller's job performance. Pammenter and Kodadek visited Westside and called a meeting with Swanson and Weller. Pammenter conducted the meeting and discussed what he saw as some deficiencies in the maintenance of the facility and then began to address Weller's recent "insubordination". At that point, Weller stood up and said it was not insubordination to challenge Swanson when he wasn't following company policy, that he was tired of the way he was being treated by Swanson and that he was done talking about the subject as long as Swanson was there.

As Weller began to leave, Pammenter asked him if he had his keys to the facility and Weller responded that they were in his office. Pammenter followed Weller to his office. On the way, the two discussed Swanson's contention that Weller had been acting insubordinate and Weller's contention that Swanson was altering company policy and making inappropriate comments to Weller regarding his age and disability. Pammenter told Weller that he had to realize that Swanson was in charge. When they reached Weller's office, Weller gave Pammenter his keys and then left.

## III. ANALYSIS

Westside asserts multiple grounds for granting summary judgment in its favor.

First, it asserts that Weller quit his job and was not fired. Alternatively, it argues that if Weller was fired, it was Pammenter who fired him and Weller has no evidence that Pammenter was motivated by discrimination of any sort. Westside contends that the only evidence of discrimination is Weller's own self-serving statements regarding Swanson. Whether Weller can establish a prima facie case of either age or disability discrimination is also challenged by Westside. Of course, Weller takes issue with Westside's contentions, arguing that he did not quit his job, that Swanson was the person behind his firing and that he is not the lone witness to Swanson's discriminatory statements and actions. He asserts that there is ample circumstantial evidence to support an inference of discrimination in connection with his termination and that he has set forth a prima facie case of both age and disability discrimination.

Since Pammenter asked Weller to turn in his keys, the court or any fact finder can easily conclude from the circumstances that Weller did not voluntarily quit his job. Westside may elect to argue differently to a jury, but at this stage such an argument falls way short of supporting a summary judgment. The same can be said of Westside's argument that Pammenter fired Weller and there is no evidence of discriminatory motive on Pammenter's part. It is undisputed that Pammenter was on site as a result of Swanson contacting him regarding Weller's recent conduct and specifically his reaction to Swanson asking for a doctor's slip to justify an appointment. Pammenter's instruction to Weller that he had to understand that Swanson was in charge at the facility, at a

minimum, supports a conclusion that, without Swanson's influence, Weller might still be on the job. Even if Pammenter made the decision to terminate Weller and was unaware of any discriminatory bias in Swanson's complaints, if those complaints influenced the decision and were motivated by improper bias, Westside can be held liable. *Byrd v. Illinois Dept. of Public Health*, 423 F.3d 696, 709 (7th Cir. 2005).

Weller is protected against age discrimination under the Age Discrimination in Employment Act ("ADEA") because he has passed his fortieth birthday. 29 U.S.C. § 631(a). In order to be entitled to the protection provided under the Americans with Disabilities Act ("ADA"), a plaintiff is required to show that he is a "qualified individual with a disability". 42 U.S.C. § 12112(a). Such an individual is someone with a disability who, with or without reasonable accommodation, can perform the essential functions of the job he holds or desires. 42 U.S.C. § 12111(8). A "disability" under the ADA is: 1) a "physical or mental impairment that substantially limits" a major life activity; 2) "a record of such an impairment"; or, 3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). There is more than sufficient evidence to support that Swanson regarded Weller as disabled as well as evidence that could establish that Weller's injury substantially limited his ability to walk, which is a major life activity.

Westside argues that Weller's evidence of discrimination is limited to his own self-serving testimony that Swanson made inappropriate statements regarding his age and disability. However, in addition to Weller, Robert Gray and Brenda Branson both

testified that Swanson criticized Weller based on his disability and Branson confirmed an inappropriate criticism of Weller based on age. Nor are statements like " he is old, worthless and needs to be gone" simply stray remarks when made by the target employee's supervisor. *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653-653 (7th Cir. 2000). Even isolated comments may constitute direct evidence of discrimination if they are made near in time to the adverse employment action and are of the type which in and of themselves suggest that a decision maker was driven by an illegal employment criterion. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). If Weller's testimony regarding Swanson's comment to him about why he was the "wrong person on the bus" is believed, that comment alone, made a week prior to his termination, would suffice to support a conclusion that Weller was fired because of his age and disability.

While it is hard to believe that in this age of political correctness any manager, even a biased one, would openly tell an employee he was "too old and crippled", Weller's testimony on that point is buttressed by other employees hearing similar comments from Swanson. The credibility of Gray and Branson, two individuals who left the employ of Westside under less than favorable circumstances, may become a tough issue for Plaintiff; but their testimony strains credulity little more than Swanson and Pammenter's statements to the effect that Weller voluntarily quit his job. If believed, their testimony could support a conclusion that Weller was the victim of discrimination.

## IV. CONCLUSION

The court finds that at this point Plaintiff has produced sufficient direct evidence of discriminatory intent, in the form of both testimony of blatantly bias statements made by a decision maker and circumstantial evidence of that individual's general bias against the infirm and aged, to withstand Defendants' pursuit of summary judgment. Accordingly, Defendants' Motion for Summary Judgment (Docket # 36) is **DENIED**.

**IT IS SO ORDERED**, this 1st day of August 2006.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:
Jeffrey Scott Beck
BAKER & DANIELS
jeffrey.beck@bakerd.com

Gail M. Flatow
gailflatow@aol.com

Alan L. McLaughlin
BAKER & DANIELS
alan.mclaughlin@bakerd.com